UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| IPXPHARMA, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 3:14-cv-1545 |
| v. | ) Judge Aleta A. Trauger |
| | ) |
| MILLENNIUM PHARMACEUTICALS, INC., | ) |
| | ) |
| Defendant, | ) |

## MEMORANDUM

Pending before the court are two motions filed by the defendant, Millennium Pharmaceuticals, Inc. ("Millennium"). Millennium has filed a Motion to Dismiss For Failure to State a Claim and for Lack of Standing under Rules 12(b)(1) and 12(b)(6) (Docket No. 32) and a Motion to Transfer Venue Under 28 U.S.C. § 1404(a) (Docket No. 27), both of which the plaintiff opposes. For the reasons stated herein, the Motion to Dismiss will be granted, the case will be dismissed without prejudice under Rule 12(b)(1) because the plaintiff lacks standing to sue, and the Motion to Transfer Venue will be denied as moot.

## BACKGROUND

### I. Overview

This case concerns alleged infringement of U.S. Patent No. 6,171,786 (the "'786 Patent") (Docket No. 1, Compl., Ex. A), which relates to a special method for preventing multidrug resistance in cancer cells during chemotherapy treatments (the "Invention"). IPXpharma, LLC ("IPX") is a Texas limited liability company that was formed in April 2014. IPX purports to maintain a principal place of business in Nashville, Tennessee. It has five members: (1) IP

1

Equity Management, a Texas corporation; (2) Alexander Shtil, a resident of Russia and one of the Invention's inventors, (3) Igor Roninson, a resident of South Carolina and one of the Invention's inventors, (4) Senex Biotechnology, a Delaware corporation with a principal place of business in South Carolina,[1] and (5) Karthik Gopalakrishnan, a resident of North Carolina. The court will refer to Roninson and Shtil as the "Inventors."[2] The defendant, Millennium, is a Delaware corporation that is headquartered in Massachusetts. Millennium manufactures and markets an anti-cancer drug called "VELCADE®."

On July 28, 2014, IPX filed a Complaint against Millennium. (Docket No. 1.) In the Complaint, IPX alleges that it is the "owner of all right, title, and interest in" the '786 Patent and that Millennium's marketing and sale of VELCADE® has infringed the '786 Patent. The Complaint is essentially a form pleading with no contextual allegations.[3]

## II. The Motion to Dismiss

Millennium has moved to dismiss the Complaint on two grounds. First, Millennium has moved to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), contending that IPX

---

[1] The website for this company identifies Roninson as its founder. (Docket No. 30, Ching Aff., Ex. I.)

[2] As discussed herein, the name of a third inventor, Preet Chaudhary, appears on certain earlier patent applications related to the Invention. For reasons not clear from the public record, Chaudhary's name is not listed in the '786 Patent Application, the '786 Patent itself, or any of the relevant subsequent transactions related to the Invention, all of which involved only Roninson and Shtil. The parties here do not contend that these earlier references to Chaudhary are relevant. Accordingly, any references to the "Inventors" in this opinion will refer only to Roninson and Shtil.

[3] This is not an uncommon pleading practice in patent infringement cases. Under Fed. R. Civ. P. 84, "[t]he forms in the Appendix suffice under these rules and illustrate the simplicity and brevity that these rules contemplate." Form 18 in the Appendix of Forms sets forth a simple means of pleading a patent infringement claim.

2

lacks standing to sue for past infringement of '786 Patent. Second, Millennium has moved to dismiss for failure to state a claim under Rule 12(b)(6), contending that IPX has failed to plead a claim for direct infringement.[4]

Particularly with respect to the issue of standing, the parties have filed a substantial volume of materials and multiple legal briefs. The progression of the briefing and the supporting materials is atypical and requires some explanation.

In support of its Motion to Dismiss, Millennium filed a Memorandum of Law (Docket No. 33) and the supporting Declaration of Leizel A. Ching (Docket No. 34), which attaches publicly available records from the United States Patent and Trademark Office ("USPTO") relating to the issue of IPX's standing. With respect to standing, Millennium argued – with appropriate citation to USPTO records – that (1) the Inventors had assigned their interests in the Invention and its related patents to the Board of Trustees of the University of Illinois (the "University") in 1995,[5] (2) there was no public record indicating that the University subsequently assigned any interest in the '786 Patent back to the Inventors, and (3) as a consequence, a publicly recorded assignment in April 2014 between the Inventors and IPX (the "April 2014 IPX Assignment Agreement"), in which the Inventors purported to assign to IPX the right to sue for past infringement of the '786 Patent, was a legal nullity.

---

[4] Millennium has also contended that IPX had failed to plead a claim for induced or contributory infringement. In its Response, IPX has clarified that its Complaint does not actually assert a specific claim for induced or contributory infringement.

[5] As explained herein, there were several iterations of the patent as it related to the original Invention. It is undisputed that the specific patent at issue in this case was a continuation-in-part of the pending patent application at the time of this 1995 assignment from Roninson and Shtil to the University.

IPX filed a Response in opposition to the Motion to Dismiss (Docket No. 40), in support of which it filed the Declaration of Cole R. Gresham (Docket No. 40, Attach. No. 1). The Gresham Declaration attached (1) a copy of a March 2014 "Invention Assignment Agreement" between the University and the Inventors, and (2) a copy of a Form 10-K filed by Millennium on March 10, 2004. In its Response, IPX argued that the March 2014 Invention Assignment Agreement, which was not recorded with the USPTO, showed that the University had in fact assigned its interests in the '786 Patent (including the right to sue for past infringement) back to the Inventors in March 2014. IPX argued that, as a consequence, the Inventors in fact possessed the right to sue for past infringement when they executed the (recorded) April 2014 IPX Assignment Agreement, which assigned that right to IPX.

Millennium filed a Reply (Docket No. 43), in which it asserted that, as a matter of contractual interpretation, the March 2014 Invention Assignment Agreement (of which Millennium was unaware until IPX filed its Response brief) did not convey the right to sue for past infringement to the Inventors.

With leave of court, IPX has responded to Millennium's position concerning the March 2014 Invention Assignment Agreement by filing a Sur-Reply (Docket No. 52). In the Sur-Reply, IPX has pivoted its legal position concerning standing. IPX now takes two positions that are essentially at odds with the arguments in its Response: (1) in its Sur-Reply, IPX does not dispute that, as a matter of law, the March 2014 Invention Assignment Agreement did not convey the right to past enforcement back to the Inventors, but (2) IPX now contends that the March 2014 Invention Assignment Agreement was *not* the operative assignment document for purposes of standing. Instead, IPX now represents that the University had actually assigned all of its interests in the '786 Patent (including the right to sue for past infringement) to the Inventors in

4

February 1999 – fifteen years before the March 2014 Invention Assignment Agreement between the same parties. IPX argues that the agreement is reflected in a February 2, 1999 letter from Susan F. Gray, a Marketing and Transfer Specialist for the University's Intellectual Property Office, to Kevin E. Noonan, the prosecuting attorney for the Invention. IPX's Sur-Reply refers to this letter as a "Letter Agreement." The court will simply refer to it as the "Gray Letter." In support of its position, IPX has filed (1) the Declaration of Jill Tarzian Sorensen (Docket No. 52, Attach. No. 1), a University administrator who avers that the parties entered into this agreement as reflected in the attached Gray Letter, and (2) the Declaration of Igor Roninson (Docket No. 50, Ex. 2), who also avers that the parties entered into this agreement in 1999, that he construed the Gray Letter as reflecting that agreement, that he paid all of the prosecution and maintenance expenses associated with the '786 Patent from that point forward, and that he regarded the March 2014 Invention Assignment Agreement as merely providing "a more formal confirmation of the February 1999 agreement that assigned the '786 patent back to Dr. Shtil and me, in order to facilitate the transaction with IPXpharma."

In response to IPX's Sur-Reply, Millennium has filed a Supplemental Response (Docket No. 56), in which it addresses IPX's arguments concerning the purported February 1999 agreement between the University and the Inventors. Millennium argues that IPX has not demonstrated that the University and the Inventors entered an actual, valid, and binding assignment agreement in February 1999 for multiple reasons. In support of one of its arguments, Millennium has filed the supplemental Declaration of Leizel A. Ching (Docket No. 56, Attach. No. 1), which attaches a copy of the University's "Rules of Organization and Procedure."[6]

---

[6] The Ching declarations filed in support of the Motion to Dismiss contain sequentially lettered exhibits across three docket entries. (*See* Docket Nos. 34 (Exs. A-D), 44 (Exs. E-F), and 56,

### III. Motion To Transfer Venue

Millennium has also filed a Motion to Transfer Venue under 28 U.S.C. § 1404(a), contending that the relevant factors justify a transfer of this case to the United States District Court for the District of Massachusetts.

The Motion to Transfer Venue has also spawned a substantial volume of filings. In support of its Motion to Transfer, Millennium has filed (1) a Memorandum of Law (Docket No. 28), (2) the Declaration of Linda McCampbell (Docket No. 29), a paralegal who personally investigated whether IPX in fact maintains a principal place of business in Nashville; (3) the Declaration of Leizel A. Ching (Docket No. 30); and (4) the Declaration of Stephen M. Gansler, Millennium's Senior Vice President of Human Resources (Docket No. 31). IPX has filed a Response in opposition to the Motion to Transfer (Docket No. 41), in support of which it has filed the Affidavit of Richard Maradik (*id.*, Attach. No. 1) and the Affidavit of Ed Powell (*id.*, Attach. No. 2). Millennium has filed a Reply (Docket No. 49), in support of which it filed the supplemental Declaration of Leizel A. Ching (*id.*, Attach. No. 1).[7]

Because the case is subject to dismissal based on lack of standing alone, the court will address the standing inquiry first.

### MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

### I. Legal Standard for Rule 12(b)(1) Motion

---

Attach. No. 1 (Ex. G).) For ease of reference, the court will cite these exhibits collectively as "Dft. MTD Ex. [X]."

[7] As with the Motion to Dismiss, the declarations filed by Millennium in support of its Motion to Transfer contain sequentially lettered exhibits. (*See* Docket Nos. 29 (Exs. A-D), 30 (Exs. E-P), and 49 (Q-T).) For ease of reference, the court will refer to each of these exhibits as "Dft. MTT Ex. [X]."

"Standing goes to a court's subject matter jurisdiction." *Kepley v. Lanz*, 715 F.3d 969, 972 (6th Cir. 2013) (internal quotation and brackets omitted).[8] Thus, a complaint may be dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) if the plaintiff lacks standing to bring suit. *See, e.g.*, *Taylor v. KeyCorp*, 680 F.3d 609 (6th Cir. 2012) (affirming district court's grant of Rule 12(b)(1) motion to dismiss for lack of standing); *Allstate Ins. Co. Global Med. Billing, Inc.*, 520 F. App'x 409, 410-11 (6th Cir. 2013) (stating that lack of standing is treated as an attack on the court's subject matter jurisdiction and is therefore considered under Rule 12(b)(1)). When a defendant challenges the plaintiff's standing to sue under Rule 12(b)(1), the burden is on the plaintiff to show that jurisdiction exists. *Taylor*, 680 F.3d at 612; *Lewis v. Whirlpool Corp.*, 630 F.3d 484, 487 (6th Cir. 2011); *Golden v. Gorno Bros, Inc.*, 410 F.3d 879, 881 (6th Cir. 2005).

"Rule 12(b)(1) motions to dismiss . . . generally come in two varieties: a facial attack or a factual attack." *Gentek Bldg. Prods.*, *Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). Here, Millennium factually attacks IPX's standing to sue. When a Rule 12(b)(1) motion contests subject matter jurisdiction factually, the court must "weigh the evidence" in order to determine whether it has power to hear the case. *DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004). When the facts are disputed, "[t]he district court has broad discretion to consider affidavits, documents outside the complaint, and to even conduct a limited evidentiary hearing if necessary." *Cooley v. United States*, 791 F. Supp. 1294, 1298 (E.D. Tenn. 1992), *aff'd sub nom.*, *Myers v. United States*, 17 F.3d 890 (6th Cir. 1994). The court can do so without converting the

---

[8] Although the Federal Circuit has jurisdiction over substantive issues of patent law, district courts apply the regional circuit's legal standards concerning procedural issues. *See In Re Tech U.S. Corp.*, 551 F.3d 1315, 1319 (Fed. Cir. 2008). Accordingly, here, the court applies the Sixth Circuit's Rule 12(b)(1) standard.

motion into a motion for summary judgment. *Id.* No presumptive truth applies to the plaintiff's factual allegations, and the court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994).

## II. Relevant Facts

The materials outside the Complaint filed by the parties have fleshed out relevant details concerning the '786 Patent and the assignment of interests in that patent, including the right to sue for past infringement. The evidence establishes the following facts:

- On September 18, 1992, inventors Preet Chaudhary and Igor Roninson filed patent application No. 07/947,659 (the "'659 Patent Application").[9]

- On January 10, 1995, inventors Chaudhary, Roninson, and Alexander Shtil filed patent application No. 08/370,724 (the "'724 Patent Application"), which was a continuation in part of the '659 Patent Application.[10]

- On March 29, 1995, inventors Shtil, Roninson and Chaudhary executed an agreement with the Board of Trustees of the University of Illinois concerning the Invention. (Dft. MTD Exs. A and B). In that agreement, they assigned to the University their "entire right, title and interest in the invention or improvements" of the Invention. IPX does not dispute that, by operation of law, this assignment (the "March 1995 Assignment Agreement") immediately vested in the University all legal ownership and rights to the Invention.[11] Indeed, the cover of the later-filed '786 Patent Application (filed on June 7, 1996) and the Patent itself (issued on January 9, 2001) both identify the University as the existing assignee of that patent.

---

[9] *See* Compl., Ex. A, '786 Patent Application, at p. 2 (referencing '659 Patent Application); *see also* USPTO Patent Application No. 07/947,659 (publicly available).

[10] *See* '786 Patent Application; *see also* USPTO Patent Application No. 08/370,724 (publicly available).

[11] The document recorded with the USPTO was executed by Chaudhary on January 26, 1995 and by Shtil and Roninson on March 29, 1995. (*Id.* at pp. 2-3.)

- On January 16, 1996, the USPTO recorded the March 1995 Assignment Agreement between the Inventors and the University. (Dft MTD Exs. A and B.)

- On June 7, 1996, Shtil and Roninson filed an application for the '786 Patent (the "'786 Patent Application"), identifying it as a continuation-in-part of '724 Patent Application and the (by then abandoned) '659 Patent Application. (Dft. MTD Ex. C at p. 5.) The '786 Patent Application continued to identify the University as the Assignee. (*Id.*, Ex. C at p. 4.)

- On February 2, 1999, Susan Gray, a Marketing and Technology Transfer Specialist for the University's Intellectual Property Office, sent a letter to Kevin E. Noonan, the patent's prosecuting attorney. (Sorensen Decl., Gray Letter.) In substance, the letter simply stated as follows: "Dear Kevin, The University of Illinois at Chicago will no longer be pursuing prosecution of the above named invention. The invention is being returned to the inventors who will, as of the date of this letter, assume responsibility for all patent applications, prosecution and maintenance and their associated costs." Roninson and Shtil were copied on the letter. The document was not signed in the name of the University's comptroller or secretary, it does not bear an endorsement from the University's counsel, and it was not recorded with the USPTO.

- On January 9, 2001, the USPTO granted the '786 Patent Application and issued the '786 Patent. On the date of publication, the Patent identified Shtil and Roninson as the "Inventors" and identified the University as its Assignee. ('786 Patent at p. 2.)

- On September 12, 2012 – 20 years from the date on which the '659 Patent Application was filed – the '786 Patent expired. Accordingly, any infringement of the '786 Patent could only have occurred between June 7, 1996 (when the '786 Patent Application was filed) and September 18, 2012. The court will refer to this time period as the "relevant time frame."

- With respect to the relevant time frame, the USPTO has no record of any amendments to the relationships set forth in the March 1995 Assignment Agreement, wherein Chaudhary, Roninson, and Shtil had assigned their interests in the Invention to the University.

- On March 21, 2014, Roninson and Shtil executed an Invention Assignment Agreement with the University. (Docket No. 40, Attach. No. 1., Gresham Decl., Ex. A.) In the March 2014 Assignment Agreement, the University states, among other things, that it "has proprietary rights to the invention" and that the University had determined that it was "in the best interests of the parties" for the University "to assign all right, title, and interest UNIVERSITY may have now in any and all patent rights to such INVENTION to the INVENTORS[.]" Consistent with those representations, in the agreement the University "hereby assigns to

9

INVENTORS all of UNIVERSITY'S right, title, and interest to all patents and patent applications covering the INVENTION, and INVENTORS agree to accept such assignment hereunder." The agreement contains no references to any intervening assignments back to the Inventors of patent interests related to the Invention. The agreement is also silent with respect to the right to sue for previous infringement of the '786 Patent.

- On March 28, 2014, IPX filed a Certificate of Formation with the Texas Secretary of State. (Dft. MTT Ex. F.)

- On April 3 and 7, 2014, Shtil and Roninson (respectively) signed a purported "Assignment" to IPX of their "entire right, title and interest throughout the world" in the '786 Patent, including their "right to sue for and collect profits or damage due or accrued in connection with any and all past, present, and future infringements of the Patent or the Inventions[.]" (April 2014 IPX Assignment Agreement.)

- On April 25, 2014, IPX filed a record of the April 2014 IPX Assignment Agreement with the USPTO.

- On July 28, 2014, IPX filed the Complaint in this case, seeking recovery from Millennium for infringement of the '786 Patent.

### III. The Assignments

#### A. The March 1995 Assignment Agreement

It is undisputed that the March 1995 Assignment Agreement vested in the University vested all legal ownership and rights to the Invention. *See Imation Corp. v. Koninklijke Philips Elecs., N.V.*, 586 F.3d 980, 986 (Fed. Cir. 2009); *DDB Tech., LLC v. MLB Advanced Media, L.P.*, 517 F.3d 1284, 1290 (Fed. Cir. 2008).

#### B. The March 2014 Invention Assignment Agreement

Although IPX initially argued that the March 2014 Assignment Agreement conveyed all interests in the '786 Patent back to the Inventors at the time of its execution – including the right to sue – IPX seemingly abandoned that position in its Sur-Reply, with good reason.

10

As a general rule, only a party that possessed legal title to a patent at the time the infringement occurred can bring suit to recover damages for that infringement. *See Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359, 1367 (Fed. Cir. 2010); *see also Mas-Hamilton Grp. v. LaGard, Inc.*, 156 F.3d 1206, 1210 (Fed. Cir. 1998); *Arachnid v. Merit Indus., Inc.*, 939 F.2d 1574, 1579 (Fed. Cir. 1991). As a narrow exception to this rule, a party that acquires legal title to a patent may sue for past infringement if, and only if, the assignment explicitly conveys that right. *See Arachnid*, 939 F.2d at 1579 n.7 (stating that the right to sue for past infringement "must be express, and can not [sic] be inferred from an assignment of the patent itself"); *Moore v. Marsh*, 74 U.S. 515, 522 (1868) ("[I]t is a great mistake to suppose that the assignment of a patent carries with it a transfer of the right to damages for infringement committed before such an assignment.") Accordingly, courts will not infer the assignment of the right to sue for past infringement; thus, "bare reference to all right, title, and interest does not normally transfer the right to sue for past infringement." *Minco v. Combustion Eng'g*, 95 F.3d 1109, 1117 (Fed. Cir. 1996); *see also Messagephone, Inc. v. SVI Sys.*, 243 F.3d 556 (table), 2000 WL 1141046, at *5 (Fed. Cir. Aug. 11, 2000) (finding that grant of "entire right, title, and interest" in the asserted patents did not convey right to sue for past infringement, where assignment was "silent as to [the assignee's] right to sue for infringement that occurred prior to that date").

Here, the March 2014 Invention Assignment Agreement conveys only the University's "right, title and interest" in the '786, but it contains no explicit reference to the right to sue for past infringement. Thus, as a matter of law, the University's conveyance of rights back to the Inventors under that agreement did not include the right to sue for past infringement. This detail is crucial: it means that, in connection with the March 2014 Invention Assignment Agreement, the University retained the right to sue for past infringement (*i.e.*, infringement that occurred

11

during the relevant time frame). Thus, when the Inventors entered into the April 2014 IPX Assignment, the Inventors had no past enforcement rights to convey to IPX, thereby depriving of IPX of standing to sue for past infringement of the '786 Patent.

### C. The Claimed February 1999 Assignment

Because the March 2014 Invention Assignment Agreement did not convey past enforcement rights to the Inventors, IPX now claims that the University had transferred those rights through the Gray Letter that IPX characterizes as a "Letter Agreement." IPX's standing therefore hangs on the tenuous position that the Gray Letter constituted an actual and valid assignment of interests in the '786 Patent Application from the University to the Inventors at the time it was written. IPX essentially takes the position that the March 2014 Invention Assignment Agreement between the University and the Invention was a mere legal formality that "confirmed" and incorporated the February 1999 agreement. Having weighed the available evidence, the court finds that IPX's arguments are without merit for several reasons and that IPX has failed to show that it has standing to sue.

First, the Gray Letter does not comply with the University's own rules and procedures for entering into binding legal contracts. (*See* Docket No. 56, Ex. G, "General Rules Concerning University Organization and Procedure.") Section 4 of the University's Rules sets forth the rules for the "Award and Execution of University Contracts." Among other requirements, "contracts to which the University is a party shall be signed by the comptroller of the Board of Trustees and attested to by the secretary of the Board of Trustees" (Section 4(c)), and contracts must be executed "in the name of the comptroller and the secretary of the board" with their consent (Section 4(i)). Section 5 of the Rules sets forth rules for the "Drafting and Approval of University Contracts." Among other requirements, all contracts must be approved as to legal

12

form and validity by university counsel, and that approval must be "endorsed in writing on the contract[.]"  (Section 5(b).)

The February 1999 letter from a single university administrator does not even arguably comply with the University's own guidelines.  It is not signed in the name of the comptroller and secretary of the Board and it contains no written endorsement from University counsel.  On the University's own terms, it did not enter into a contract with the Inventors in February 1999, regardless of how a single administrator and Roninson subjectively construed the Gray Letter.

Second, IPX's position that the University effectively relinquished all of its interests in the Invention back to the Inventors in February 1999 is fundamentally inconsistent with the terms of March 2014 Invention Assignment between those same parties.  Unlike the brief February 1999 letter, the March 2014 Assignment Agreement is a detailed and formal contract between the University and the Inventors that complies with the University's contract-formation guidelines: it is signed by the University's comptroller and secretary and it bears a signed endorsement by University counsel.  Furthermore, in contrast to the Gray Letter, it contains clear and defined terms, including the identity of the contracting parties, representations concerning the University's present interests in the '786 Patent, a description of the consideration for the agreement, and other specific terms concerning the parties' respective future obligations (or lack thereof) relative to the '786 Patent and the Invention.

The details of the March 2014 Assignment Agreement also belie IPX's argument: the agreement references the University's *present* "right, title and interest" in the '786 Patent as of the contract date; it states that the University, as of the date of the contract, believed that it was in the University's interests to convey its rights back to Shtil and Roninson on the date of execution; it assigns the University's "right, title and interest" – and only those interests – in the

13

'786 Patent back to the Inventors; and it states that the Inventors "agree to accept such assignment." The agreement is written in the present tense – not the past tense – and has an effective date of March 21, 2014. It makes no reference to any previous assignment of rights related to the '786 Patent (in February 1999 or otherwise), nor does it purport to "memorialize" or "confirm" any prior agreement among the parties to transfer rights back to the Inventors.

The March 2014 Invention Assignment Agreement also contains terms that are inconsistent with IPX's position that the purported February 1999 agreement left "no qualifications or carve-outs reserving any rights in the invention to [the University]" and that "there can be little doubt that [the University] intended to transfer all of its rights in the invention to the inventors" at that time. (Sur-Reply at p. 6.) Specifically, in the March 2014 Invention Assignment Agreement, the Inventors granted the University a perpetual, royalty-free license to use the invention for research and educational purposes, which the contract states constitutes the consideration for the agreement.[12] In the agreement, the University also places restrictions on the Inventors' further development of the Invention, directing them not to use University funds for the purpose of development and stating that, to the extent that they used University funds

---

[12] In the March 2014 Invention Assignment Agreement, the University purported to convey all rights, title, and interest in the Invention to the Inventors in return for the Inventors' promise to "grant" a license back to the University to use the Invention at the University of Illinois for research and educational purposes. Although it is tangential to the court's analysis, it appears that, as a legal matter, this license did not necessarily operate as a "carve-out" of the University's assignment to the Inventors. Rather, it functioned as a promise that the Inventors would, as a condition of receiving the University's entire right, title, and interest in the Invention going forward, license some portion of those rights (the right to use the Invention for the University's research and educational purposes) back to the University on a perpetual, irrevocable, royalty-free, and non-exclusive basis. At any rate, as a practical matter, this contractual arrangement attached qualifying conditions to the University's assignment to the Inventors. If the Inventors had already possessed the rights assigned under the agreement, they would have been under no obligation to honor (or to enter into) the licensing term.

14

Case 3:14-cv-01545 Document 57 Filed 12/09/14 Page 14 of 19 PageID #: 1148

after the effective date of the agreement for that purpose, they would be obligated to compensate the University. If the University had no rights to convey in the first place, it would have made no sense for the University to enter into an agreement that retained these qualifications and carve-outs.

Third, even on its own terms, the Gray Letter was essentially aspirational. At most, it indicates that the University (or at least a single administrator within it) intended to convey rights relating to the '786 Patent to the Inventors, but it does not itself constitute an assignment of those rights. The letter is addressed to the prosecuting attorney, not the Inventors, and it simply directs the prosecuting attorney to cease working on the patent application.

In their affidavits, another University administrator and Roninson aver that they had reached an agreement to assign the University's rights related to the Invention in February 1999 and that the letter reflects that agreement. Roninson also avers that, after receiving the letter, he paid all of the prosecution and maintenance expenses associated with the '786 Patent, and he avers that the March 2014 Invention Assignment Agreement was simply designed to provide "a more formal confirmation" of the prior agreement. Although Roninson may have a colorable argument for some type of post-1999 detrimental reliance vis-à-vis the University, neither his subjective interpretation of the letter (nor Sorensen's) is persuasive for the reasons previously stated.

Moreover, if both the University and the Inventors actually understood in 1999 that the University had assigned all interests in the Invention back to the Inventors, one would expect that the University and the Inventors (1) would have informed the USPTO about the assignment before the USPTO ruled on the pending '786 Patent Application, which identified the University as the "Assignee," (2) would have informed the USPTO that a representation on the Patent

15

(issued in January 2001), which continued to identify the University as the "Assignee" of the patent, was materially incorrect and misleading, and (3) would have incorporated or otherwise referenced the February 1999 agreement in the formal March 2014 Assignment Agreement approved by University counsel and the appropriate University officials.

The much more sensible interpretation of the available evidence is that, even if a University administrator and the inventors intended to enter into an assignment in 1999, the University did not act on that intention until March 2014. Nothing in the valid and binding March 2014 Assignment Agreement suggests otherwise, and, if the University actually meant to memorialize a prior agreement, it would have done so in the March 2014 Assignment Agreement by the simple expedient of referencing a prior understanding and stating that the agreement should be construed as effective *nunc pro tunc* to February 1999.

In light of these considerations, the court finds that IPX has not met its burden to show that it has standing to sue. The available evidence does not show that the Inventors possessed the right to sue for past infringement when they entered into the April 2014 IPX Assignment Agreement, wherein they purported to assign that right to IPX. Thus, IPX has not shown that it possesses the right to sue for past infringement of the '786 Patent, and this case must be dismissed for lack of subject matter jurisdiction.

Because IPX has not met its burden to show that subject matter jurisdiction exists, the court need not address Millennium's contention that IPX has failed to state a direct infringement claim under Rule 12(b)(6).

## MOTION TO TRANSFER

The court is dismissing this case for lack of subject matter jurisdiction, which thereby renders moot Millennium's Motion to Transfer under 28 U.S.C. § 1404(a). Although IPX

16

Case 3:14-cv-01545   Document 57   Filed 12/09/14   Page 16 of 19 PageID #: 1150

currently lacks standing to sue for past infringement related to the '786 Patent, IPX may be able to acquire standing in the future and may seek to refile this case. In the interest of sparing the parties and the court further time and effort in the future, the court states that, based on the evidence currently before it, the relevant § 1404(a) factors strongly favor transfer to the District of Massachusetts.

In ruling on a motion to transfer venue under § 1404(a), a "district court should consider the private interests of the parties, including their convenience and the convenience of potential witnesses, as well as other public-interest concerns, such as systemic integrity and fairness, which come under the rubric of 'interests of justice.'" *Moore v. Rohm & Haas Co.*, 446 F.3d 643, 647 n.1 (6th Cir. 2002) (quoting *Moses v. Business Card Express, Inc.*, 929 F.2d 1121, 1137 (6th Cir. 1991); *Kerobo v. Sw. Clean Fuels Corp.*, 285 F.3d 531, 537 (6th Cir. 2002). The Sixth Circuit has suggested that relevant factors to consider include: (1) the convenience of the parties and witnesses; (2) the accessibility of evidence; (3) the availability of process to make reluctant witnesses testify; (4) the costs of obtaining willing witnesses; (5) the practical problems of trying the case most expeditiously and inexpensively; and (6) the interests of justice. *Reese v. CNH Am., LLC*, 574 F.3d 315, 320 (6th Cir. 2009).

Briefly, the court makes the following non-exhaustive observations:

- The connections between this case and Nashville are negligible. IPX appears to have been created for the purpose of pursuing claims for past infringement of the '786 Patent, at least four of its five members reside in geographic locations far from this district, and it remains unclear what "operations," if any, IPX conducts at its Nashville address. Also, the case has no meaningful factual connection to Tennessee: IPX was not created until nearly 18 months after the relevant time frame; the alleged infringer, Millennium, is headquartered in Massachusetts; and there is no reasonable expectation that corporate testimony from IPX (or any of its affiliate entities) would contribute meaningfully to a trial.

17

- The court anticipates that most of the relevant witnesses – if not all– are either (a) located in Massachusetts, or (b) located outside of Massachusetts and outside of Tennessee. Among these potential witnesses, Millennium has identified at least six non-party witnesses located in Massachusetts who would be beyond the subpoena power of this court, whereas IPX has not identified any non-party witnesses in Tennessee.

- The burden on both parties to litigate in Tennessee would be substantial, whereas the burden on Millennium would be much more limited (and the burden on IPX about the same) to litigate in Massachusetts. Most of IPX's members are not within a practical driving distance of Tennessee, meaning that litigating in Tennessee would not be substantially less burdensome for them than litigating in Massachusetts. By contrast, litigating in Massachusetts district court would reduce travel time for Millennium witnesses and corporate representatives to a matter of minutes.

- Records relevant to this case are located in Massachusetts, not Tennessee. Although this consideration carries limited weight in a typical civil case, it continues to carry weight in patent cases even "in the era of electronic storage and transmission." *In re Genentech, Inc.*, 566 F.3d 1338, 1345-46 (Fed. Cir. 2009). IPX has provided no indication that any relevant records are located in Tennessee. By contrast, the bulk of Millennium's records concerning VELCADE®, including records relating to its research and development, marketing, and licensing, etc., are located in Massachusetts, as are documents relating to relevant prior art.

- The District of Massachusetts has adopted a local rule specific to the administration of patent infringement cases (D. Mass. Local Rule 16.6), which "was crafted to facilitate the efficient and equitable adjudication of patent disputes." *Trustees of Boston Univ. v. Everlight Elec. Co., Ltd.*, 2013 WL 2932822, at *2 (D. Mass. June 12, 2013). By contrast, this district does not have a comparable local rule specific to patent cases. Millennium has also presented unrebutted evidence that, on a per-judge basis, judges in Massachusetts have had approximately half the caseload of judges within this district over the past several years. (*See* Dft. MTT Ex. P, Judicial Caseload Profiles for District of Massachusetts and the Middle of District of Tennessee) (reflecting approximately 280-320 cases per judgeship in D. Mass. during the years 2008-2013 and approximately 470-550 cases per judgeship in M.D. Tenn. over the same time frame).)

- In contrast to IPX, which was formed shortly before it filed this lawsuit, Millennium is a large company with over 1,100 employees in Cambridge, Massachusetts, the active ingredient in VELCADE® was discovered and developed by scientists in Massachusetts, and IPX's lawsuit therefore

18

likely calls into question the work and reputation of many Massachusetts residents. Massachusetts therefore has a much stronger local interest in this lawsuit than residents of this judicial district.

The remaining factors are generally neutral. Thus, on balance, it appears that the public and private interest factors would strongly favor litigating this case in Massachusetts.[13]

**CONCLUSION**

Millennium's Motion to Dismiss will be granted, Millennium's Motion to Transfer will be denied as moot, and this case will be dismissed without prejudice.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge

---

[13] The parties have engaged in a robust debate about whether the Sixth Circuit, this court, and other courts have erred in stating that, "[u]nless the balance of these factors weighs strongly in favor of the defendant seeking transfer, the plaintiff's choice of forum should rarely be disturbed." *Samples v. Midland Credit Mgmt., Inc.*, 2012 WL 2576392, at *4 (M.D. Tenn. July 2, 2012) (internal citation omitted). In *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947), the Supreme Court articulated this standard with respect to the federal common law doctrine of *forum non conveniens*, under which a district court could dismiss a case (a drastic remedy) that was filed in an improper venue. Following *Gilbert*, Congress enacted the transfer statutes, including 28 U.S.C. § 1404(a), which largely superseded the doctrine of *forum non conveniens* and authorized district courts to transfer – rather than necessarily dismiss – cases based on the convenience of the parties and the interests of justice. In *Norwood v. Kirkpatrick*, 348 U.S. 29 (1955), the Supreme Court considered the intervening enactment of § 1404(a), declaring that a transfer under § 1404(a) was distinct from dismissal based on the doctrine of *forum non conveniens* and that, as a consequence, courts could grant transfers to another proper venue upon a "lesser showing of inconvenience" than the *Gulf Oil* test. Even though *Gulf Oil* does not govern § 1404(a) transfers in light of *Norwood*, many courts, including the Sixth Circuit, have recited the *Gulf Oil* standard with respect to motions under § 1404(a). *See, e.g.*, *Reese v. CNH America LLC*, 574 F.3d 315, 320 (6th Cir. 2009); *Samples*, 2012 WL 2576392, at *4. The defendants, largely relying on a district court's detailed criticism of *Reese* and similar cases in *Esperson v. Trugreen Ltd. P'ship.*, 2010 WL 4362794, at *3-*4 (W.D. Tenn. Oct. 5, 2010), make a persuasive case that this entire line of precedent may be wrong. The court need not resolve the legal issue here, other than to state that it would likely transfer the case even under the "strong" showing standard.

19